Filed 6/11/14  P. v. Phillips CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065784 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1202282) |
| ANTHONY PHILLIPS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, J. David Mazurek, Judge.  Affirmed.

Law Offices of John P. Dwyer and John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Anthony Phillips of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found that Phillips had used a handgun during the commission of the homicide (§ 12022.53, subds. (b), (c), (d)). The jury was unable to reach a verdict on the gang allegation (§ 186.22, subd. (b)(1)(C)) and that allegation was dismissed.

The court sentenced Phillips to an indeterminate term of 40 years to life in prison. Phillips appeals contending the trial court erred in failing to instruct the jury with CALCRIM No. 3471,[2] on its own motion, to the effect that an aggressor can recover the right to self-defense if he stopped the aggression, communicated that fact to the victim and gave the victim the chance to stop fighting.

Phillips contends that if we consider the issue forfeited for failure to request the instruction, we should then find trial counsel was ineffective. We will find the trial court

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    CALCRIM No. 3471 provides: "A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if:
    1. (He/She) actually and in good faith tried to stop fighting; [AND]
    2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.)
    *<Give element 3 in cases of mutual combat.>*
    [AND 3. (He/She) gave (his/her) opponent a chance to stop fighting.]
    If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.
    [However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]
    [A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

2

did not have a duty to give such instruction as there is no substantial evidence to support it. Thus we will not address the claim of ineffective assistance of counsel and affirm the judgment.

STATEMENT OF FACTS

The respondent's statement of facts accurately sets forth the facts in the light most favorable to the trial court decision and we incorporate it here.

On May 27, 2012, Latrice Cloyd attended a gathering at a San Bernardino apartment complex. Cloyd argued with her boyfriend, Maurice Major, a West Covina gang member. When Major hit Cloyd in the face with a closed fist, she walked across the street and called 911 to report the assault. When she reported the assault, Cloyd stated that Major had a gun and drugs. Cloyd testified that she lied to the 911 operator about the gun and drugs because she wanted to "scare" Major, the father of her child, in order to get him to leave the party.

Cloyd sat on a brick wall across the street from the gathering for about 30 minutes. A woman approached and told her that someone at the party was "trippin," and about to start shooting a gun. When she looked back towards the gathering, Cloyd saw appellant, a Delman Heights Bloods gang member, call Major over to him. Appellant and Major then argued for about 10 minutes. Cloyd testified that appellant pulled out a gun, aimed it at Major's chest and began firing. Cloyd heard seven or eight shots. Cloyd did not see Major grab towards his waistband, reach into his pockets, or pull out a gun. Cloyd watched appellant shoot Major. Major collapsed and died from the gunshots. Two bullets struck his chest, one hit his back and one struck his arm.

3

After shooting Major, appellant put the gun away and ran off. The mother of appellant's child, Francea Kemp, testified that appellant called her and stated that he had been shot and would be home shortly. Ten minutes later appellant arrived at Kemp's home, where he sometimes stayed. Appellant's elbow, where he claimed to have been shot, appeared to have a scratch or scrape. Appellant told Kemp that something happened when he got into an argument. Appellant said that Major argued with him, but appellant told him to "just be cool." Appellant said that Major[3] kept clutching at something and so appellant cautioned the party crowd to back up because he did not know what Major might do. Appellant told Kemp that he knew Major had a gun.

Appellant told Kemp that because Major "wouldn't let it go," appellant determined "at that point it was going to be him or me." Appellant told Kemp that at that point, both men started shooting. In her testimony, Kemp agreed that appellant said that Major "actually started shooting back at him[.]" Kemp testified that she could not recall if appellant said that Major had actually pointed a gun at appellant. However, Kemp told an investigating police officer that although appellant said that Major was acting "like he had a gun," appellant never actually saw Major with a gun. Kemp further reported to police that appellant told her that he shot first and Major returned fire.

Law enforcement processed the murder scene. Detective Brian Lewis testified that he observed nine shell casings and bullet fragments. Lewis also observed six bullet

---

3    In his statements to Kemp, appellant did not identify the person he shot as Major. However, as this point is not in dispute, respondent has referred to this "other person" as Major.

4

holes in the side of the apartment building, and a possible bullet strike to an adjacent tree. All of the shell casings recovered from the scene were scattered within 18 feet of one another. The shell casings were around Major's body. The recovered shell casings, as well as the bullet fragments, were later determined by forensic analysts to have been fired from the same .40-caliber Smith & Wesson handgun. No guns were recovered near Major's body or from the scene.

San Bernardino Sheriff's Department Crime Lab analyst Jason McCauley testified that he analyzed a gunshot residue kit collected from Major. Seven gunshot residue particles were found on Major, five particles on his left hand and two on his right. McCauley testified that anything within 12 feet of a discharging gun would be exposed to gunshot residue particles, so if Major had been within that distance from the shooter, it would not be unusual for him to have particles on him.

Appellant was arrested the next day at Kemp's house. When the police arrived, appellant instructed Kemp to not let them in unless they had a warrant. Appellant told Kemp that police cannot come in a house without a warrant. After his arrest, appellant agreed to speak with Detective Albert Tello. Appellant initially denied knowing anything about the shooting. However, when Tello confronted him with the accountings of witnesses, appellant recalled that he had been at the scene of the crime. However, appellant stated that he left before the shooting. After he left, he heard shots, saw people running, and heard the police coming. When Tello asked appellant why he had initially said he was never there, appellant did not answer. He just looked down.

5

In a jail house call from appellant to Kemp, appellant spoke with Kemp about the fact that she had been called to testify. Appellant asked Kemp if she had her "blueprint" ready.

**Defense Evidence**

Appellant testified that he went to a gathering. For protection, he took his loaded .40-caliber Smith & Wesson handgun. Appellant knew Major, as the two had been friendly while in jail together. However, at the gathering, the two argued about a misunderstanding. Appellant knew Major was intoxicated and armed with a revolver. Although Major was being overly aggressive to appellant, appellant wished to "give [Major] a pass." Appellant never showed his gun to Major, or pulled it out.

Despite appellant's effort to find peace with Major, Major pulled out his gun and began firing at appellant. Appellant ran for cover. Appellant feared for his life. As appellant attempted to find cover, he pulled out his gun and returned fire. Appellant testified that he only shot at Major because Major began shooting at him first and appellant was afraid. On cross-examination, appellant clearly detailed the sequence of events: Major went for his gun and appellant ran for cover. Major began firing his gun at appellant, and only then did appellant return fire.

Appellant further testified on cross-examination that before the shooting, appellant never let Major know that he was also armed with a gun. Appellant only returned fire to defend himself. Appellant threw the gun away in a trash can the next day. Finally, appellant admitted that he had a "Crip Killer 187" tattoo and acknowledged that he had killed a Crip in this case, Major.

6

## DISCUSSION

Phillips admitted he shot the victim. He testified he shot the victim following an unprovoked attack by the victim who produced a revolver and began shooting at Phillips. The defenses offered were self-defense and imperfect self-defense. The court instructed the jury on the principles applicable to those defenses and on murder as well as voluntary manslaughter. Neither the defense nor prosecution requested CALCRIM No. 3471. Nor did either side argue the principle of when an aggressor can regain the right of self-defense. Instead, Phillips argues the trial court had a duty to so instruct even in the absence of a request.

### A. Legal Principles

A trial court has the duty to instruct on all material issues presented by the evidence even though no request has been made by counsel. This is often referred to as a "*sua sponte*" duty. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) The *sua sponte* duty to instruct applies where there is substantial evidence to support a defense and the defendant is relying on the defense or the proposed defense is not inconsistent with the defendant's theory of the case. (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.)

### B. Analysis

CALCRIM No. 3471 applies to cases where there is substantial evidence of mutual combat or where the defendant was the initial aggressor, but communicated to the opponent that he or she wanted to terminate the fight and gave the opponent an opportunity to stop the fighting. Under that scenario, the instruction provides that the initial aggressor can regain the right to self-defense where, notwithstanding the

7

communicated effort to stop the fight, the opponent continues. Phillips argues such instruction was appropriate in this case. We disagree.

There are basically two possible sets of "facts" presented in this case. The eye witnesses testified that Phillips called the victim over to him, they argued loudly and then Phillips pulled out his handgun and started shooting. The victim fell where he was standing.

Phillips's version of the events was that the victim approached him and looked "aggressive," by which Phillips meant the victim's facial features were "aggressive." The victim did not make aggressive physical movements. For his part, Phillips testified that he tried to calm the victim and avoid a confrontation. According to Phillips, the victim suddenly started shooting at Phillips who ran away and only shot back in self-defense as he attempted to reach cover. In short, Phillips's version was that he was never the aggressor.

While the parties disagreed over the facts of the events, there was no contention by anyone that there was mutual combat. Mutual combat consists of fighting by mutual agreement or consent. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046-1047.) On appeal Phillips cannot point to any evidence of mutual consent or implied agreement but argues since Phillips and the victim were in rival gangs, the jury could imply an agreement to engage in mutual combat. We find no basis in this record for such inference and the parties did not argue mutual combat to the jury.

Turning to the second principle of CALCRIM No. 3471, that the aggressor can recover the right of self-defense, we find there is no evidence in this record to justify the

8

instruction. The only preshooting "aggression" that counsel claims the jury could use to think Phillips was the initial aggressor is that Phillips and the victim had a loud argument. Respectfully, loud argument is not the type of activity referred to in the self-defense instruction. Neither Phillips nor the victim would have the right to use force merely because there was a "loud argument" without any apparent threat of physical force. The prosecution's case was built on the evidence that Phillips started the fight by pulling his gun and shooting at the victim. The defense was that the victim started the fight by shooting at Phillips before he even took his gun out of his pocket.

There is no possible scenario from this evidence from which the jury could have found that Phillips was the aggressor, *and communicated the desire to stop the fight and that the victim, given the opportunity to stop, failed to do so*. Simply put, the jury was properly instructed on all of the relevant principles of self-defense and related lesser included offenses. The parties vigorously disputed the facts and, at the end of the trial, the jury rejected Phillips's version of the events and properly convicted him of murder.

As we have noted above, since we find CALCRIM No. 3471 had no application to these facts we decline to address the claim of ineffective assistance of counsel or the question of which standard of harmless error should apply.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.